UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SARAH TATE,

    Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

Case No. 2:13-cv-11473
Honorable Laurie J. Michelson
Magistrate Judge Michael J. Hluchaniuk

**OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION [18], DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [12], AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [15]**

    Plaintiff Sarah Tate has been diagnosed with major depression, bipolar disorder, and borderline personality disorder. Primarily because of these impairments, Tate maintains that she became disabled from full-time work in 2006. In October 2010, Tate, then 22 years old, applied for supplemental security income under Title XVI of the Social Security Act. A social security administrative law judge, noting that supplemental security income cannot be awarded for periods before the application is filed, concluded that Tate had not been disabled since she filed her application. After the Social Security Administration's Appeals Council denied Tate's request for further administrative review, Tate filed this appeal from the Commissioner's determination that she was not disabled. Both Tate and the Commissioner then filed motions for summary judgment, which were referred to Magistrate Judge Michael J. Hluchaniuk for a recommended disposition.

    Now before the Court is Magistrate Judge Hluchaniuk's Report and Recommendation to grant the Commissioner's summary-judgment motion, deny Tate's, and affirm the Commissioner's disability determination. (*See generally* Dkt. 18, R & R.) Tate has filed a single

objection to the magistrate judge's Report and Recommendation: that the magistrate judge did not address her two specific arguments regarding the administrative law judge's justifications for discounting her testimony of disabling impairments. (*See generally* Dkt. 19, Pl.'s Objs.) Having reviewed the ALJ's opinion, the relevant medical records, the parties' summary-judgment briefs, the magistrate judge's Report, Tate's objections, and the Commissioner's response to those objections, the Court ADOPTS the Report and Recommendation.

## I.

### A.

The administrative record in this case spans over 700 pages. Neither party provided a summary of the record. The following description of Tate's mental and emotional impairments is sufficient for resolving her objections to the Report and Recommendation.

Tate had a difficult childhood. She had limited contact with her biological father and did not have a good relationship with her mother. (Tr. 331.) Tate moved a lot. (*Id.*) At age 14, Tate was sexually assaulted by three teenagers, two of them adults (i.e., over eighteen). (*Id.*) Tate drank heavily during her teenage years. (*Id.*) She became pregnant for the first time at age 17. (*Id.*) Tate's mother was eventually assigned guardianship of Tate's first child. (*Id.*) In 2007, Tate, then age 19, married a 34-year-old man from Jamaica. (Tr. 331.) Tate and her husband had two children, one in October 2007, the other in April 2010. (*Id.*)

A February 2010 case-management note from Michigan Psychiatric and Behavior Associates provides, "[Tate] was referred to case management due to being [six] months pregnant with a one year old at home, husband recently left her, no income[,] and a history of chronic depression, anxiety and passive suicidal thoughts." (Tr. 702.) Tate reported, "I'm about to have a third baby. I'm not working. I don't have any income." (*Id.*) The note indicates that

Tate had been working as a vacuum cleaner salesperson prior to being placed on maternity leave. (Tr. 313, 319.)

Also in February 2010, Michael Brady, Ph.D., performed a psychological exam of Tate for Michigan's Disability Determination Service, a state agency that helps the Administration evaluate social security claimants for disability. (Tr. 452.) Dr. Brady noted that Tate's depression symptoms worsened after she was raped in 2001. (*Id.*) Tate said that as a result of that assault she "feels like crap" with low self-esteem. (*Id.*) After performing a mental-status exam, Dr. Brady diagnosed Major Depressive Disorder and Borderline Personality Disorder. (Tr. 455.) He thought that Tate's functioning was limited as follows:

> Her ability to relate and interact with others, includ[ing] coworkers and supervisors, is impaired. She was occasionally tearful throughout the evaluation and was in obvious distress. Her depression and distress could affect her interpersonal relationships in the workplace. Because of her emotional struggles she will struggle to complete simple and complex tasks without major limitations. Her ability to maintain concentration is impaired. As a result [o]f her emotional state she may often be distracted and her effectiveness and performance will likely be limited and slowed. Her ability to withstand the normal stressors associated with a workplace setting is poor.

(Tr. 455–56.)

In April 2010, ten days after giving birth to her third child, Tate saw Dr. Kishore Kondapaneni, a psychiatrist whom she had also seen in 2009. (Tr. 262.) Despite having recently started on Wellbutrin and Lamictal, Dr. Kondapaneni noted, "[Ms. Tate] continues to present with increasing depression, cr[ies] easily and feels crappy all day and also tends to get frustrated easily. . . . She is having ongoing relationship problems with her husband, who put[s] her down emotionally and verbally [and] that [is] increasing her frustration." (*Id.*) Dr. Kondapaneni's mental-status findings included anxious and depressed mood, "poor" attention and concentration, and "poor" judgment and insight. (Tr. 263.) But Tate's cognitive functioning was intact, and she

had no impairment with short- or long-term memory. (*Id.*) Dr. Kondapaneni diagnosed bipolar mood disorder, depressed type, and assigned a Global Assessment of Functioning score of 55 (thereby indicating moderate symptoms). (*Id.*)[1] He increased Lamictal and Wellbutrin and gave Tate Ativan for when her anxiety became severe. (*Id.*)

In October 2010, Tate reported to her counselor, "I woke up this morning and found out my husband was gone and went back to Jamaica." (Tr. 326.) Tate called her husband's bondsman and was informed that she was now responsible for the $8,000 in bond. (*Id.*) And Tate's husband had "t[a]k[en] all of her money before he left for Jamaica." (*Id.*) About ten days later, Tate saw Dr. Kondapaneni who noted that Tate had been sleeping only three or four hours per night. (Tr. 324.) He encouraged Tate to take Klonopin at night and increased Tate's prescription of Wellbutrin. (*Id.*)

In November 2010, Tate's case manager noted that Tate "had difficulty buying into the idea of taking medication to assist with mood stabilization." (Tr. 343.) Tate had initially only taken her medication "on an as needed basis, such as when she [wa]s depressed or feeling upset." (*Id.*) More recently, Tate "ha[d] committed to taking medication" and reported benefits. (*Id.*) Although Tate's depression had actually increased with her husband leaving, Tate's case manager noted that "[t]hese feelings . . . would be expected due to the circumstances." (*Id.*)

---

[1] A Global Assessment of Functioning ("GAF") score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* ("DSM–IV"), 30–34 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32.

A GAF score of 51 to 60 reflects "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM–IV at 34.

In December 2010, Tate reported to Brenda Ruppal, a nurse working with Dr. Kondapaneni, that she felt "terrible" and that she could not "do anything" for herself. (Tr. 276.) Tate stated that she felt "overwhelmed" and that her anxiety was "terrible." (*Id.*) She was also doing "terribl[y]" at medication compliance and had been using alcohol. (*Id.*) Tate was prescribed Klonopin, Lamictal, and Wellbutrin and counseled about medication compliance. (*Id.*)

In February 2011, Tate told Ruppal that she had been off medication for two months and that her mother was taking care of her three children. (Tr. 275.) Tate rated her depression as a "five" on a ten-point scale and reported mood swings and verbal outbursts. (*Id.*) But Tate denied anxiety, panic attacks, or increased distractibility. (*Id.*) Tate was prescribed Lamictal and Wellbutrin. (*Id.*)

In March 2011, Dr. Robert Newhouse reviewed Tate's file for the Administration's initial disability determination. (Tr. 115–17.) Dr. Newhouse rated Tate's capacity to perform various tasks then stated in summary:

> Major Depressive Disorder, Bipolar Disorder with some limitations in motivation, concentration and pace. [Medical Source Statement] is noted and suggests her performance will be limited and slowed[,] and while this is true[,] evaluation of totality of the [medical evidence of record] it appears that [Tate] is able to be independent in [her activities of daily living] to [the] level of motivation. [She] has gained control of her substance abuse and is consistent with treatment which was not true in the past. For these reasons the [Medical Source Statement] is given less than great weight. [Tate] may have trouble with complex detailed tasks and function best in small familiar groups. Claimant retains the ability to do simple tasks on [a] sustained basis.

(Tr. 117.)

In April 2011, Tate's case manager for mental-health services completed a Clinical Assessment Summary. (Tr. 598–608.) It provides in part,

> [Tate] admits to periods of mania and depression. She makes poor decisions, especially during the manic phases of her illness. She drinks during these periods, quit[s] jobs, does not pay bills resulting in unstable living conditions and does not

5

> follow up with responsibility in other areas of her live. During depressive states[,] [Ms. Tate] reports not having energy to get herself up, dressed, and experiences a hard time providing care for her family.

(Tr. 603.) Although the Assessment is dated April 2011, it is unclear whether this statement accurately described Tate's condition at that time: the exact same statement appears in a March 2010 assessment by Tate's case manager. (Tr. 337.)

In September 2011, Tate saw Dr. Gary Ralph, apparently for the first time. (Tr. 585.) Dr. Ralph noted symptoms of post-traumatic stress disorder related to Tate's sexual abuse. (*Id.*) Tate reporting having had severe depression for weeks at a time and mood swings lasting hours at a time. (*Id.*) Dr. Ralph described Tate has being calm and attentive, with an "entirely normal" mood with "no signs of depression or mood elevation." (Tr. 586.) Tate's thinking was logical, and her insight into her illness and her social judgment were both "fair." (*Id.*) Dr. Ralph diagnosed Mood Disorder (not otherwise specified), Post Traumatic Stress Disorder, Alcohol Dependence, and Suspected Attention Deficit Hyperactive Disorder, Inattentive Type, and wanted to rule out bipolar disorder. (*Id.*)

The next month, Tate told Dr. Ralph that she continued to have depressive symptoms. (Tr. 588.) In describing Tate's mental status, Dr. Ralph noted, "[s]igns of moderate depression are present." (*Id.*) Dr. Ralph started Tate on Wellbutrin. (Tr. 584.)

In February 2012, Tate, then 23 years old, returned to see Dr. Kondapaneni. (Tr. 718–19.) Tate was not taking medication and reported feelings of depression, lack of energy, and lack of motivation. (Tr. 718.) Tate stated she was having difficulty dealing with her three children, a five-, three-, and one-year old. (*Id.*) She reported a recent incident where she hit her daughter, had a blackout, and later could not remember striking her daughter; child protective services was notified. (*Id.*) Dr. Kondapaneni noted that Tate had divorced her husband but was in a "not so

6

good" relationship with a boyfriend. (Tr. 718.) (Tate would later testify that she only moved in with her boyfriend because she was homeless without any other place to go. (Tr. 77.)) In describing Tate's mental status, Dr. Kondapaneni noted that Tate's mood was "emotional and depressive" with crying during the interview. (Tr. 719.) Dr. Kondapaneni noted that Tate's attention and concentration were "poor" and the same for her judgment and insight. (*Id.*) He diagnosed Major Depression, Moderate, Recurrent, with Impulse Control Disorder. (*Id.*) Dr. Kondapaneni recommended that Tate start on Wellbutrin, Trileptal, and Xanax. (*Id.*)

## B.

At her March 2012 disability hearing before Administrative Law Judge Tammy A. Thames ("the ALJ"), Tate testified to her work experience, the college classes she was taking, and the limiting effects of her impairments. (*See generally* Tr. 52–108.)

Tate stated that she had last worked in May 2011. (Tr. 59.) She worked for "Duwall," a company that helped people on social security "get out in the work field and do things." (Tr. 60.) Tate's attendance became a problem at Duwall; Tate explained, "It was just—I was depressed and didn't want to go, or I would go and they'[d] tell me, 'There's no . . . work here to be done today,' and [I was] not going to sit there if [I was] not going to get paid for it. So I'[d] leave." (Tr. 83.) After Tate took a medical leave of absence from Duwall, Tate did not return to work because they would not accommodate her school schedule. (Tr. 84.) Tate also worked at Delphi for a short time, but, because she was still on her 90-day probation period, she did not get paid during the company's two-week holiday break; "So when they closed during Christmas and New Year's break, I just kind of got used to not going to work anymore, that when they started back up, I never showed back up." (Tr. 86.) Tate said that she worked an assembly line at Delphi for fifteen hours per day. (*Id.*) Tate also worked at McDonald's for almost three years, first at age

7

fourteen. (Tr. 79.) She explained, "I loved going to work, and then I just started not being reliable. Just one day I don't want to get out of bed, so I call in sick, or my friend will be like, 'Sarah, well you can't leave me at your house by myself.' . . . So then I'll—because my friend told me to call in, I'll call in, or I'm just—I can't—when I get depressed, I don't want to get out of bed." (Tr. 79.)

Tate also testified to being in her second semester of taking college coursework. (*See* Tr. 62–64, 81, 83.) The first semester, Tate took only college preparatory classes. (Tr. 81.) At the beginning of that semester, for about four or five weeks, Tate said that she was a "straight A student, same day I got my homework I did it." (Tr. 64.) But then she started feeling overwhelmed: "just emotionally not being able to handle being a mom, and doing my homework, and being a student, and trying to be a maid, and a cook, and everything all at the same time. So it all hit me, and I felt like, 'Well, I want to sleep in today. I don't want to go to class.' . . . [S]o then I wouldn't go to class, and I ended up failing every class last semester." (Tr. 64.) At the time of the hearing, Tate was taking non-preparatory college classes, but going to school had been difficult: "I start daydreaming, fall asleep sometimes." (Tr. 83.)

When the ALJ asked Tate why she believed that she could "not handle a simple work assignment, showing up to work every day, being around other people," Tate responded in part, "Like I've gone a week before without taking a shower, because I've been so depressed I don't want to do anything, wearing the same pajamas for four or five days in a row, never changing." (Tr. 79.) Tate said that even on her good days she would sometimes be "too hyper" with fast, nonstop talking. (Tr. 61.) As for bad days: "I seclude myself from people. I kind of verbally abuse people." (*Id.*) Tate described being verbally abusive to her mother and "snap[ping] on her for no reason." (Tr. 67.) Tate testified that from October 2011 through February 2012, she did

8

not have insurance to cover the cost of medications. (*See* Tr. 66, 68–69.) The ALJ asked Tate whether, prior to October 2011, her medications had helped manage her symptoms; Tate replied, "I want to say yes, but I'm—I didn't take it long enough to know if it worked or not." (Tr. 68.) Regarding being sexually assaulted, she provided that she did not have ongoing symptoms other than getting anxious and checking on her assailant's release date. (Tr. 91.)

Tate's mother also testified at the administrative hearing. Tate's mother said that Tate's "concentration is poor—really bad. . . . [W]hen she told me she was going to enroll in school, it's—I mean I don't want to hurt her feelings, but when I—she told me she was going to enroll in school, I didn't think she was going to succeed because she has very, very, very poor concentration." (Tr. 95.) According to Tate's mother, "she hardly succeeds in anything she tries, because her concentration is so poor." (Tr. 96.) As examples, Tate's mother stated that Tate could not fold laundry and watch television at the same time or stay on topic during a conversation. (Tr. 96.)

## C.

On April 13, 2012, Administrative Law Judge Thames issued her decision. (Tr. 33–43.) After reviewing the record, the ALJ thought that Tate had the "ability to understand, remember and perform simple tasks with no production rate pace work, but rather goal oriented work. She should have no more than occasional interaction with the public or co-workers." (Tr. 37.) Coupling this residual functional capacity with testimony from a vocational expert, the ALJ concluded that Tate could work a number of jobs: food preparer, housekeeper, and packer. (Tr. 42.) As such, ALJ Thames found that Tate had not been disabled within the meaning of the Social Security Act from the date of her application, October 26, 2010. (Tr. 43.)

## II.

This Court performs a de novo review of those portions of Magistrate Judge Hluchaniuk's Report and Recommendation to which Tate has objected. 28 U.S.C. § 636(b). The Court need not and does not perform a de novo review of the report's unobjected-to findings. *See Schaefer v. Modelski*, No. 13-CV-13669, 2014 WL 3573270, at *1 (E.D. Mich. July 21, 2014) ("Although a court must review timely objections to a magistrate judge's report and recommendation, a court may adopt, reject, or amend the portions of a report and recommendation to which no party properly objects." (citing Fed. R. Civ. P. 72(b)(3); *Thomas v. Arn*, 474 U.S. 140, 150 (1985))); *Garrison v. Equifax Info. Servs., LLC*, No. 10-13990, 2012 WL 1278044, at *8 (E.D. Mich. Apr. 16, 2012) ("The Court is not obligated to review the portions of the report to which no objection was made." (citing *Arn*, 474 U.S. at 149–52)).

## III.

Tate's summary-judgment motion raised two claims of error. She argued that the ALJ failed to properly evaluate the opinion of Dr. Brady, the examining (but non-treating) physician. (Dkt. 12, Pl.'s Mot. at 4–9.) Tate also argued that the ALJ erred in assessing her credibility. (Pl.'s Mot. at 9–13.) The magistrate judge, after setting out these arguments in detail, was not persuaded by either one. (*See* Dkt. 18, R & R at 24, 34.)

Tate objects only to the magistrate judge's credibility determination. (*See generally* Dtk. 19, Pl.'s Objs.) She emphasizes that her credibility argument was two-pronged: (1) that because she could not afford treatment, the ALJ erred in discounting her credibility based on non-compliance with treatment, and (2) that the ALJ mischaracterized her activities of daily living (primarily her ability to attend school and parent), "creating a false impression of Plaintiff's ability to manage stress and full-time work." (Pl.'s Objs. at 2.) Tate argues that the magistrate

judge, while addressing the ALJ's credibility analysis generally, did not address these two arguments specifically. (*See id.*) The Court is not persuaded by Tate's objections.

### A.

Tate claims that the ALJ erred in discounting her credibility for not complying with prescribed treatment and that the magistrate judge erred in failing to understand her argument about the ALJ's error. (*See* Pl.'s Objs. at 2.) In relevant part, the ALJ stated,

> Overall, the claimant's treatment has been relatively conservative in nature. According to the claimant, in terms of her mental symptoms, treatment with prescription Lamictal and Wellbutrin makes her "feel better." Further, she indicated that her anxiety has "gone down" while taking prescription Klonopin. Finally, the claimant has not been entirely compliant with her treatment recommendations. She is not always compliant with her psychotropic treatment regimen and abuses substances when stressed (Ex. 15E; Cl. Testimony).

(Tr. at 40.) According to Tate, the magistrate judge said only the following about this rationale: "'the ALJ properly noted that plaintiff's symptoms improved with compliance.'" (Pl.'s Objs. at 2 (quoting R & R at 30).) This statement misses the point, says Tate, because she "never claimed that treatment was ineffective, but rather asserted that the ALJ inappropriately used Plaintiff's inability to afford treatment in a negative way when evaluating her credibility." (*Id.*) As legal support for her argument, Tate cites Social Security Ruling 96-7p, which states, "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." S.S.R. 96-7p, 1996 WL 374186, at *7–8. Tate asserts that the magistrate judge did not even mention S.S.R. 96-7p in his Report and Recommendation. (Pl.'s Objs. at 2.)

11

But the record reflects that Tate was not compliant with medication even when she had financial coverage for it. As Tate's case manager noted in November 2010, Tate initially "had difficulty buying into the idea of taking medication to assist with mood stabilization." (Tr. 343.) And even though Tate had "committed" to taking medication by November 2010, the next month, Tate reported that she had been doing "terribl[y]" at medication compliance and had been using alcohol. (Tr. 276.) As such, the premise of Tate's argument is tenuous: that the reason she did not take her medications was because she could not afford them. And Tate has not argued an alternate premise: that her mental and emotional impairments caused her to not comply with treatment.

Moreover, the ALJ's narrative indicates that she did not place great weight on Tate's non-compliance. The ALJ mentioned that fact in the context of explaining that Tate's medications helped her when she took them. (Tr. 40.) And, as will be discussed below, the ALJ provided several other reasons, supported by substantial evidence, for discounting Tate's credibility.

**B.**

Tate also objects that the ALJ erroneously relied on her ability to attend school and care for her children in discounting her credibility and that the magistrate judge misunderstood the import of the ALJ's error. The ALJ reasoned that Tate's ability to "manage a full-time schedule at home and at school, strongly suggest[ed] that [Tate's] symptoms [were] less severe than alleged and that she could maintain sustained full-time employment consistent with the residual functional capacity." (Tr. 41.) And the magistrate judge explained that "the ALJ did not equate plaintiff's status as a full-time student with a finding of no limitations, but rather as consistent with the RFC to perform simple work with no production rate pace work and no more than

12

occasional interaction with the public or co-workers. [Tr. 41.] This finding is supported by substantial evidence." (R & R at 30 n.2.) Tate argues: "The Report only addresses Plaintiff's argument in a footnote, and in doing so concludes that the ALJ was proper in using the mischaracterized finding because the ALJ still acknowledged some limitations, and Plaintiff's school was only one factor." (Pl.'s Objs. at 3.) Tate says that the magistrate judge's analysis "fail[s] to recognize that the [ALJ's] mischaracterization [of her schooling and at-home schedule] significantly alters the evidence in the record regarding [her] abilities." (*Id.*)

The Court does not disagree with the magistrate judge's reasoning. The ALJ did not find that Tate's ability to attend school and care for her children suggested that Tate could perform any type of full-time work, but instead full-time work "consistent with the residual functional capacity." (Tr. 41.) And the testimony Tate cites to show that the ALJ mischaracterized her abilities as a student and parent is somewhat equivocal. True, Tate testified that she failed all of her first-semester classes except math and that "being a mom," "doing [her] homework," "being a student," and "trying to be a maid, and a cook" felt overwhelming. (Tr. 64, 81.) On the other hand, Tate testified that she did very well in school for the first four or five weeks. (Tr. 64.) And regarding her second semester, Tate had only missed three classes by the time of the March 2012 hearing. (Tr. 83.) It was thus not unreasonable for the ALJ to conclude that Tate's partial ability to parent and manage school supported her limited residual functional capacity assessment of Tate.

### C.

Even if the Court were to find that the ALJ erred in discounting Tate's credibility for medication non-compliance and because she overstated Tate's ability to manage her daily

activities while enrolled in school, Tate has not persuaded the Court that these errors warrant remand.

The Sixth Circuit has endorsed harmless-error review of an ALJ's credibility assessment. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) ("We now make explicit what we have previously adopted by implication: harmless error analysis applies to credibility determinations in the social security disability context."). Indeed, in a report and recommendation in another case, this Court stated, "*Ulman* suggests that, in reviewing for harmless error in the context of an ALJ's credibility assessment, this Court should determine whether the ALJ 'cited' substantial evidence to support his conclusion regarding [the claimant's] credibility after discounting for his . . . erroneous findings." *Riser v. Comm'r of Soc. Sec.*, No. 13-11135, 2014 WL 1260127, at *16 (E.D. Mich. Jan. 31, 2014) (Michelson, M.J.), *report and recommendation adopted by*, 2014 WL 1260127 (E.D. Mich. Mar. 26, 2014) (Rosen, J.); *see also New v. Colvin*, No. 12-219-ART, 2013 WL 4400522, at *6 (E.D. Ky. Aug.13, 2013) (citing *Ulman* and providing, "The harmless error analysis proceeds in two steps: 1) what was the ALJ's credibility finding, and 2) leaving the problematic reasoning aside, did the rest of the ALJ's reasons support that finding?"). Accordingly, the Court will review the ALJ's narrative to determine whether, after setting aside the ALJ's arguably erroneous reasons, the ALJ cited substantial evidentiary support for her credibility determination. While the issue is close, the Court believes that she did.

As an initial matter, the Court notes that the ALJ only discounted Tate's testimony to the extent that it was inconsistent with her residual functional capacity assessment of Tate. (Tr. 40; *see also* Tr. 41.) And that residual functional capacity was quite limiting: it precluded Tate from engaging in full-time work that involved any of the following: understanding and remembering

more than simple tasks, pace-based quotas, and frequent interactions with others. (Tr. 37.) As such, the credibility inquiry can be framed this way: whether, taking the record as a whole, substantial evidence, cited by the ALJ, supports the ALJ's limited residual functional capacity assessment of Tate. If so, this would, in turn, support the ALJ's rejection of Tate's allegations of greater limitations. The Court concludes that substantial evidence supports the ALJ's residual functional capacity assessment and credibility determination.

In Tate's favor, there is record support for her testimony of disabling symptoms. There is little doubt that Tate's life stressors—her childhood, her husband, her finances—were severe. As one of Tate's counselors said about her husband's abandonment: "[depression] would be expected due to the circumstances." (Tr. 343.) Further, in February 2010, Dr. Brady performed a consultative exam and opined that Tate would "struggle to complete simple . . . tasks without major limitations" and that "[a]s a result [o]f her emotional state she may often be distracted and her effectiveness and performance will likely be limited and slowed." (Tr. 455–56.) And Dr. Kondapaneni, in both April 2010 and February 2012, provided that Tate's attention, concentration, judgment, and insight were "poor." (Tr. 263, 719.) Tate's case manager provided that "[d]uring depressive states[,] [Tate] reports not having energy to get herself up [and] dressed, and experiences a hard time providing care for her family." (Tr. 337, 603.)

On the other hand, as the ALJ noted, some of Tate's treatment notes indicate moderate symptoms. The ALJ pointed out that in October 2010, Dr. Kondapaneni found that Tate was not experiencing any medication side effects and that her mood was "euthymic." (Tr. 324; *see* Tr. 39.) The ALJ also relied on Dr. Ralph's findings. (Tr. 39.) In September 2011, Dr. Ralph found that Tate was "attentive, fully communicative, and relaxed," that her "[m]ood was entirely normal with no signs of depression or mood elevation," and that her "[s]ocial judgment [was]

fair." (Tr. 586.) In October 2011, when Tate presented with depressive symptoms, Dr. Ralph noted signs of "moderate" depression. (Tr. 584.)

The ALJ also rejected Dr. Brady's consultative opinion in favor of Dr. Newhouse's file-review opinion. (Tr. 41.) And, in accord with the ALJ's residual functional capacity assessment, Dr. Newhouse found that while Tate "may have trouble with complex detailed tasks and function best in small familiar groups," Tate could nonetheless perform "simple tasks on [a] sustained basis." (Tr. 117.) Although Tate initially challenged the ALJ's rejection of Dr. Brady's opinion (Pl.'s Mot. Summ. J. at 7–9), the magistrate judge concluded that "the ALJ was entitled to accept Dr. Newhouse's evaluation of the severity of plaintiff's impairments in preference to Dr. Brady's" (R & R at 26), and Tate has not objected to this finding, (*see generally* Pl.'s Objs.). As such, the magistrate judge's finding will stand. *Schaefer*, 2014 WL 3573270, at *1; *Garrison*, 2012 WL 1278044, at *8. So the ALJ's reliance on Dr. Newhouse's opinion further supports her residual functional capacity and credibility assessments.

The ALJ also reasonably relied on Tate's work history in assessing her credibility. (Tr. 40.) Tate testified that she did not leave her most recent place of employment, Duwall, solely because of her depression. (*See* Tr. 84.) According to Tate, a lack of work and Duwall's failure to accommodate her school schedule were also reasons why she left that job. (Tr. 83.) This is an acceptable reason to discount credibility. (*See* R & R at 31–32 (citing cases).)

All of these reasons, even in view of the contrary evidence and the ALJ's arguably erroneous rationale, substantially support the ALJ's credibility assessment. As such, remand for the ALJ to redraft her credibility analysis is not necessary. *See Ulman*, 693 F.3d at 714; *New*, 2013 WL 4400522, at *6; *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and

deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying.").

### D.

Tate disagrees. Citing *Allan v. Comm'r of Soc. Sec.*, No. 10-CV-11651, 2011 WL 2670021 (E.D. Mich. July 8, 2011), she argues that "when an ALJ's reasoning is even partially flawed," remand is appropriate. (Pl.'s Objs. at 3–4.) The court in *Allan* cited *Ford v. Astrue*, 518 F.3d 979, 982–83 (8th Cir. 2008), for the proposition that "where [an] ALJ's reasoning underlying [a] decision to discount claimant's credibility is partially, albeit not fully, flawed, remand is appropriate." 2011 WL 2670021, at *3. But that rule applied with much more force in *Allan* than in this case.

In *Allan*, the ALJ discounted the claimant's credibility for three reasons: (1) Plaintiff's MRI and EMG studies did not reflect a worsening condition over time, (2) the claimant's testimony was inconsistent with her physician's notes and testimony, and (3) the claimant's daily activities were inconsistent with her allegations. *Id.* at *2–3. The Commissioner conceded that the first rationale was error and the Court found the third erroneous. *Id.* at *3. Thus, the ALJ's erroneous reasoning was much greater than the ALJ's sound reasoning.

Here, that is not the case. As discussed, the ALJ gave several supportable rationales for discounting Tate's credibility.

### IV.

For the foregoing reasons, the Court OVERRULES Plaintiff's Objection to Magistrate's Report and Recommendation (Dkt. 19), and ADOPTS Magistrate Judge Hluchaniuk's Report and Recommendation (Dkt. 18). It follows that Tate's Motion for Remand Pursuant to Sentence Four (Dkt. 12) is DENIED and that the Commissioner's Motion for Summary Judgment (Dkt.

17

15) is GRANTED. Pursuant to sentence four of 42 U.S.C. § 405(g), the disability determination of the Commissioner is AFFIRMED.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated: September 11, 2014

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 11, 2014.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson